**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ELIZABETH S. BERARDI,

                              Plaintiff,                    1:22-cv-00159 (BKS/DJS)

v.

EUGENE J. BERARDI, JR.,

                              Defendant.

---

**Appearances:**

*For Plaintiff:*
Adam R. Shaw
Boies, Schiller & Flexner LLP
30 South Pearl Street, 11th Floor
Albany, NY 12207

John M. Lane
Lane Crowell LLP
178 Myrtle Boulevard – Suite 105
Larchmont, NY 10538

*For Defendant:*
Justin A. Heller
Brendan J. Carosi
Brian D. Deinhart
Nolan Heller Kauffman LLP
80 State Street, 11th Floor
Albany, NY 12207

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

        Plaintiff Elizabeth S. Berardi brings this diversity action against Defendant Eugene J.

Berardi, Jr. (Dkt. No. 1). The Complaint alleges that Defendant expressed an intent to breach the

Shareholder Agreements pertaining to his shares in "three New York corporations," in which

Defendant is the majority (51%) shareholder and Plaintiff is the minority (49%) shareholder. (*Id.*). The Complaint alleges four causes of action: (1) "Declaratory Judgment" under 28 U.S.C. § 2201, seeking a declaration "that the Shareholder Agreements, including the rights of first refusal" are valid, binding, and applicable to the parties; (2) "Injunctive Relief" "prohibiting Defendant from transferring the Shares"; (3) "Damages for Breach of Contract" "[i]f and to the extent Defendant has already transferred shares"; and (4) "Anticipatory Breach." (*Id.* at 6–9). Presently before the Court is Defendant's motion to dismiss the Plaintiff's declaratory judgment claim for lack of ripeness under Federal Rule of Civil Procedure 12(b)(1) and to dismiss the remaining claims for failure to state a claim under Rule 12(b)(6). (Dkt. No. 13). The parties have filed responsive papers. (Dkt. Nos. 16, 20). For the reasons that follow, Defendant's motions are granted.

## II.    FACTS[1]

### A.    Postnuptial Agreement and Divorce

Plaintiff and Defendant were married for approximately thirty years. (Dkt. No. 1, ¶ 6). In 2000, Plaintiff and Defendant entered into a post-nuptial agreement regarding "the ownership of certain assets, and the distribution of those assets in dissolution of the marriage by divorce or death." (*Id.*; Dkt. No. 20-1, at 37–50 (Postnuptial Agreement)). The agreement stated that, in the event of dissolution of the marriage, "Plaintiff would own 49% of the equity of certain businesses owned and operated by Defendant, . . . whereas Defendant would [] own 51%." (Dkt. No. 1, ¶ 6).

In 2005, Plaintiff commenced a divorce proceeding against Defendant in New York Supreme Court. (*Id.* ¶ 7). At that time, Defendant substantially owned six companies and their

---

[1] The facts are drawn from the complaint. (Dkt. No. 1). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

affiliated interests and entities: Adirondack Transit Lines, Inc. ("ATL"), Pine Hill-Kingston Bus

Corp. ("Pine Hill"), Passenger Bus Corp. ("PBC"), Coach Service America ("Coach"), Hurley

Properties, LLC ("Hurley"), and Winslow Properties, LLC ("Winslow") (collectively "the

Companies"). (*Id.* ¶ 8; Dkt. No. 17-1). "The Companies, and particularly ATL, Pine Hill and

PBC (the 'Operating Companies'), provide public transportation services throughout New York

State and certain surrounding areas, under various trade names, including Trailways." (Dkt. No.

1, ¶ 8).

In March 2009, following a trial, the court in the divorce proceeding issued a decision on,

among other things, the issue of equitable distribution. (Dkt. No. 18-4, at 2). The court

"[a]dher[ed] to the [post-nuptial agreement]" and "allocated to Plaintiff shares in the Companies

equal to a 49% interest of Defendant's holdings in each of them." (Dkt. No. 1, ¶ 9; Dkt. No. 18-

4). The allocation of equity in the Companies was "by far the largest portion of the equitable

distribution" of the marital assets. (Dkt. No. 1, ¶ 10). However, "[o]ther than a single instance

where [Coach] sold real property, Plaintiff has not received any benefits as a result of her

ownership of the [s]tock."[2] (*Id.* ¶ 11).

B.    **The Shareholder Agreements**

The shareholder agreements for each of the Operating Companies set forth the "rights

associated with shares of the Companies" and "include certain purchase rights that have at all

relevant times governed the transfer of any shares in the Operating Companies" (collectively

"the Shareholder Agreements"). (*Id.* ¶ 12). These rights "include rights of first refusal" and

"govern all future transfers." (*Id.*). Specifically, according to the complaint, each of the

---

[2] "The Companies have not issued any dividends, Plaintiff has not been permitted to have any involvement in the operation and management of the [C]ompanies, and Plaintiff has not been allowed access to the corporate books and records to independently determine how the Companies are performing or where any profits might be going." (Dkt. No. 1, ¶ 11).

Shareholder Agreements "provides that . . . no shares of the Operating Companies may be sold, disposed of, bequeathed or otherwise transferred without (a) the Companies themselves . . . having a right of first refusal to purchase those shares, and (b) if the Companies decline to exercise that right, then the other shareholders shall have a right of first refusal, in either such case subject to a purchase price set forth in the Shareholder Agreements." (*Id.* ¶ 13). These "[r]ights of [f]irst [r]efusal" "apply to any and all forms of transfer, and expressly prohibit any other transfers, including by inter-vivos trust or testamentary bequest." (*Id.*).

Plaintiff has submitted the Shareholder Agreements for ATL, Pine Hill, and PBC. The ATL "Shareholders' Agreement" contains a "Restrictions on Sale or Transfer" provision stating that: "No Shareholder shall sell, transfer, assign, encumber, give, pledge or otherwise dispose of any or all of his shares in the Corporation including an inter-vivos trust or testamentary bequest except upon the terms and conditions and in the manner hereinafter described." (Dkt. No. 17-1, at 2). However, Clause 1(b) exempts "any gift or testamentary bequest that any stockholder might hereinafter wish to make to any spouse, child or grandchild of said stockholder or niece or nephew," but notes that "any subsequent disposition of said shares by the recipients of shares . . . shall be subject to the [aforementioned] provisions . . . and the other applicable provisions of this Agreement." (*Id.* at 3). The ATL Shareholders' Agreement's "Disposition of Shares" provisions state:

> If a Shareholder ("Selling Shareholder") wishes to dispose of any or all of their shares in the Corporation in any manner, otherwise than as specifically permitted by the provisions of Clause 1(b) hereof, he shall give written notice ("Shareholder's Notice") to the Corporation and to the other Shareholders of his desire to do so, specifying the number of shares of which he wishes to dispose. The Corporation shall then have a first option, exercisable by written notice to the Shareholders, to purchase any or all of such shares, at the price specified in the Schedule annexed hereto.

> If . . . the Corporation shall not have exercised its first option with
> respect to all or any of the shares covered by the Shareholders [sic]
> Notice, then the Shareholders other than the Selling Shareholder
> shall have a second option . . . to purchase any or all of the shares
> which the Corporation does not wish to purchase.

(*Id.* at 3–4). The Pine-Hill "Shareholders' Agreement" appears to be identical in all relevant

respects to the ATL Shareholder's Agreement. (*See id.* at 24–25 (Pine-Hill Shareholder's

Agreement "Restrictions on Sale and Transfer," including "Clause 1(b)," and "Disposition of

Shares" provisions and language)).

The PBC "Stockholders' Agreement" does not contain the ATL or Pine Hill Shareholders

Agreements' "Clause 1(b)" language regarding "any gift or testamentary bequest" to a "child,"

but it similarly states that "No Shareholder shall sell, transfer, assign, encumber, give, pledge or

otherwise dispose of any or all his shares in the Corporation except to each other and any

testamentary bequest of these shares shall be accordance with the following provisions." (*Id.* at

16). The PBC Stockholders' Agreement's "Disposition of Shares" provisions are identical to

those in the ATL and Pine Hill Shareholders Agreements, set forth above. (*Id.* at 17 (PBC

Stockholders' Agreement's "Disposition of Shares" provision)).[3]

## C.      Defendant's Statements Regarding Right of First Refusal Provisions

"Defendant has . . . stated, directly and through others, including his accountant, . . . that

Plaintiff will never receive any financial benefits from her ownership interests in the

---

[3] The complaint alleges at the outset that this action arises "out of Plaintiff's ownership of a minority shareholder interest in <u>*three* New York corporations</u> that own and operate public transportation services." (Dkt. No. 1, ¶ 1 (emphasis added)). Elsewhere, the complaint refers to the "six companies" Defendant "owned substantially"—ATL, Pine Hill, PBC, Coach, Hurley, and Winslow, collectively as "the Companies," but distinguishes ATL, Pine Hill, and PBC as "the Operating Companies." (*Id.* ¶ 8). Nowhere does the complaint explain this distinction. Moreover, the complaint alleges that Plaintiff's owns 49% interest of the shares in "the Companies," which implies the "six companies," (*id.*), rather than the "three New York corporations," the complaint refers to at the outset, (*id.* ¶ 1). Plaintiff only provided Shareholder Agreements for ATL, Pine Hill, and PBC. (Dkt. No. 17-1). And yet, Plaintiff seeks a declaration "that the Shareholder Agreements, including the rights of first refusal set forth there in, are valid and binding, and that they apply to the parties and to the shares of *the Companies* that the parties presently own." (Dkt. No. 1, ¶ 23 (emphasis added)).

Companies." (Dkt. No. 1, ¶ 14). Defendant has also proposed to buy Plaintiff's shares in the

Companies, "at a price drastically lower than its value, thus using the threat of bypassing or

violating the Rights of First Refusal as attempted leverage in obtaining a low-cost buyout of

Plaintiff's interests." (*Id.*).

In 2019, "Plaintiff, through counsel, attempted to enter into a dialog with Defendant"

regarding "certain estate plans." (*Id.* ¶ 15). In September 2019, "[a]fter Plaintiff repeated efforts

at such dialog," "Defendant advised Plaintiff, through counsel, that she could never invoke or

benefit from the rights of first refusal," because the Divorce Proceeding Decision rendered the

Shareholder Agreements' right of first refusal provisions "void," and that the right of refusal

provisions therefore "no longer exist, and do not apply to the shares owned by the parties." (*Id.*).

In August 2020, "Defendant restated that position[] through counsel." (*Id.*).

"Defendant has now stated his intention to transfer the shares in violation of the

shareholder agreements, and may have already done so." (*Id.* ¶ 1). Further, "Defendant has made

positive and unequivocal statements that he refuses, and will refuse, to honor [the Shareholder

Agreements], and specifically that he intends to transfer his shares without adhering to the rights

of first refusal set forth therein." (*Id.* ¶ 34).

### D.    Prior Litigation

In or about 2012, Plaintiff filed an action against Defendant in Supreme Court, New York

County alleging, inter alia, breach of fiduciary duty, accounting, and seeking a permanent

injunction based on Defendant's alleged attempt to prevent Plaintiff "from having any

meaningful participation in the companies' operation." *Berardi v. Berardi*, 108 A.D.3d 406, 406

(N.Y. App. Div. 2013). According to the Complaint, in that case, Defendant took a position

contrary to his present position, and argued "that the Shareholder Agreements are valid and

binding." (Dkt. No. 1, ¶ 17). Plaintiff further alleges that the New York Supreme Court and the

Appellate Division, First Department "held that the Shareholder Agreements are valid and binding on the parties, including the buyout rights and the purchase price set forth therein." (*Id.*).

## III.  DISCUSSION

### A.  Motion to Dismiss Declaratory Judgment Claim – Rule 12(b)(1)

#### 1.  Standard of Review

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted). The Court may also "refer to evidence outside the pleadings" and "take judicial notice of documents in the public record." *Krajisnik Soccer Club, Inc. v. Krajisnik Football Club, Inc.*, No. 20-cv-1140, 2021 WL 2142924, at *2, 2021 U.S. Dist. LEXIS 99456, at *5 (N.D.N.Y. May 26, 2021) (citations omitted). "The party invoking federal jurisdiction bears the burden of establishing [jurisdiction]." *Whalen v. Michael Stores Inc.*, 153 F. Supp. 3d 577, 580 (E.D.N.Y. 2015), *aff'd*, 689 F. App'x 89 (2d Cir. 2017) (quoting *Lujan*, 504 U.S. at 561).

#### 2.  Declarations[4]

Plaintiff and Defendant each submitted a declaration as did their attorneys in connection with Defendant's motion to dismiss Plaintiff's declaratory judgment claim on the ground that it is not ripe for adjudication.

---

[4] The Court has considered the declarations to the extent they are relevant to ripeness with respect to the Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction. *Krajisnik Soccer Club, Inc*, 2021 WL 2142924, at *2, 2021 U.S. Dist. LEXIS 99456, at *5.

        **a.**     **Plaintiff**

In her declaration, Plaintiff states that the "Operating Companies are the central entities owning the bus business that has been the family business for many decades." (Dkt. No. 17, ¶ 2). Plaintiff states that she has provided "the three shareholder agreements . . . that are at issue in this case," namely ATL, Pine Hill, and PBC. (*Id.*).

During their marriage, Plaintiff and Defendant "had three sons, one of whom passed away in 2014." (*Id.* ¶ 3). One of their remaining children, Alexander Berardi ("Alex") remained "in the business" following the divorce. (*Id.*). Their other remaining child, Eugene Berardi, III, "became alienated from his father, and has remained supportive" of Plaintiff following the divorce. (*Id.*). Plaintiff "very much" wants to see both her sons "benefit from the business" she helped Defendant build. (*Id.*). Plaintiff's "decision, in the divorce, [to] accept the 49% shareholder interest . . . in the Companies was based in large part on [her] desire to ensure that" both children would be "able to eventually obtain such benefit." (*Id.*). The Companies are worth "tens of millions of dollars," but the "contractual purchase price pursuant to which the Rights of First Refusal may be exercised [is] a fraction of that, approximately $2.4 million."[5] (*Id.* ¶¶ 4, 7). Plaintiff avers that she is "and will remain at all times, ready, willing and able to make any such purchase" of Defendant's stock, "for cash." (*Id.* ¶ 7).

Plaintiff does "not communicate directly with" Defendant, but, "repeatedly over the last year, through others, including his attorney and accountant," Defendant "has made clear . . . that he intends that [Plaintiff] will never receive any benefit from my ownership interest retained in the divorce." (*Id.* ¶ 4). Specifically, Defendant has stated, "through others," "that he intends to

---

[5] Plaintiff claims "the contractual purchase price for ATL is $24,000.00 per share; for PBC it is $200.00 per share; and for Pine Hill it is again $24,000.00." (Dkt. No. 17, ¶ 7). If Plaintiff purchased all of Defendant's stock at the contractual price, the total would be "$2,405,064.00." (*Id.*).

transfer all of his shares in the Companies to [their son,] Alex, and that he regards the Rights of First Refusal in the Shareholder Agreements of the Operating Companies as 'invalid and unenforceable.'" (*Id.*). Plaintiff is concerned that given Defendant's "stated view that he is not bound by the Shareholder Agreements," Defendant may also be of the view that "he could transfer some or all of his shares to literally anyone, at any time, without even so much as telling [Plaintiff]." (*Id.*). Plaintiff is also concerned that if Defendant transfers his shares to Alex or to another individual, she "would be left with no choice but to pursue [Defendant] (and perhaps also the transferee, likely [Plaintiff's] own son) for damages equal to the value of [her] interests in the Companies." (*Id.*). Plaintiff asserts that she believes it is "extremely unlikely" that Defendant would have money to pay the "value" of Plaintiff's interests in the Companies, which are worth "tens of millions of dollars," and therefore asserts that she "would be permanently and irreparably harmed by any such transfer." (*Id.*).

### b.   Defendant

In Defendant's declaration, he disputes Plaintiff's assertion that he has repeatedly communicated his intent that Plaintiff will never receive any benefit from her ownership interest in the Operating Companies as "both factually incorrect and intentionally taken out of context." (Dkt. No. 20-1, ¶ 4). Defendant explains that Plaintiff's "inability to receive [] benefits from her shares is a reality of the limitation on minority shareholder rights in the Companies," and that he has "no 'intent' whatsoever with respect to Plaintiff's shares." (*Id.* ¶ 9). Further, Defendant claims that "it was Plaintiff who reached the conclusion [that] she would not receive an economic benefit from her shares, based on the inherent limitations on minority shareholders rights in the Companies." (*Id.* ¶ 7 (emphasis omitted)). "To the extent [Defendant] or anyone on [his] behalf has ever stated [this] to Plaintiff's counsel," it was only to "remind[] Plaintiff of the realities" of her minority ownership. (*Id.*).

Regarding the Shareholder Agreements, Defendant "agree[s] that [he] may only sell or transfer [his] shares during [his] lifetime in compliance with the Shareholder Agreements and [he] ha[s] never had any intention of doing anything to the contrary." (*Id.* ¶ 10). However, Defendant "believe[s] that as a result of the divorce proceedings" both he and Plaintiff "are precluded from enforcing the transfer restrictions to prevent the other's testamentary bequest of the shares to [their] respective heirs." (*Id.* ¶ 11). Defendant points to the postnuptial agreement's "Binding on Estates" provision, which provides that the agreement "shall inure to the benefit of and shall be binding and obligatory upon the heirs, personal representatives, administrators, executors and assignees of the parties herein," (*Id.* ¶ 11; Dkt. No. 20-1, at 46), and asserts that he "believe[s] that as a result, as between Plaintiff and [himself], [they] are permitted to leave our shares to our respective heirs." (Dkt. No. 20-1, ¶ 11). Accordingly, Defendant "presently intend[s] to leave [his] shares to [his] son [Alex] by testamentary bequest, if such a bequest is determined to be valid at the time of [his] death." (*Id.* ¶ 12). Defendant avers that Plaintiff's belief that "she will have the right to purchase my shares upon my death," "is entirely speculative" as he is "65 years old and in good health" and "may very well outlive Plaintiff, in which case, under Plaintiff's line of reasoning, [he] would have the right to purchase [Plaintiff's] shares." (*Id.* ¶ 14). Defendant also observes that the "Companies could also be sold, which case [he and Plaintiff] would each receive [their] respective shares of any distributions of sale proceeds." (*Id.*).

### c.    Attorney J. Mark Lane

Plaintiff has also submitted a declaration by J. Mark Lane, who is co-counsel for Plaintiff in this action. (Dkt. No. 18). In his declaration, Lane recounts "several conversations" he had with Justin A. Heller, counsel for Defendant in this action. (*Id.* ¶¶ 2–3). Lane asserts that Heller has stated to him, "several times," that Defendant "intends to transfer his shares to [his son,]

Alex Berardi." (*Id.* ¶ 2). "When asked how he could justify that, Mr. Heller stated that the transfer of shares to [Plaintiff] in the divorce proceedings rendered the Rights of First Refusal 'invalid,' and that [Defendant] was accordingly free to transfer his shares without regard to the Shareholder Agreements." (*Id.*).

Lane states that Heller has "restated" Defendant's position several times. (*Id.* ¶ 3). "In one such conversation, Mr. Heller stated, very specifically, that to the extent [Plaintiff] might hope to ever obtain any benefit from her ownership interests in the Companies, such benefit would only come as a result of the future possible 'generosity' of Alex." (*Id.*).

### d.      Attorney Justin A. Heller

In his declaration, Defendant's counsel, Justin A. Heller, acknowledges that he has "interacted with Plaintiff's present attorney, Mark Lane, over the past several years." (Dkt. No. 20-2, ¶ 4). Heller states that he has "explained to Mr. Lane that [Defendant] intends to leave his shares to his son Alex by testamentary bequest in his will—that is, if that bequest is deemed valid at the time of Mr. Berardi's death." (*Id.* ¶ 7). Heller states he has further explained to Lane that it is Defendant's "view that because (a) the parties' postnuptial agreement provided that the respective 51%/49% split of ownership in the Companies inures to the benefit of the parties' respective heirs, and (b) [Plaintiff] prevailed in enforcing the postnuptial agreement in the divorce, she should be precluded from challenging [Defendant's] bequest to Alex at the time of his death <u>if</u> she outlives" Defendant. (*Id.* (emphasis in original) (internal citation omitted)). Heller recounts two additional discussions with Lane. The first was "[s]everal years ago," and involved "a conversation in which Mr. Lane told [him] that Plaintiff believed she would end up owning the Companies after [Defendant] died," Heller "point[ed] out that [Plaintiff] might not outlive" Defendant, and that Defendant believed that the "postnuptial agreement permitted him to leave his shares to Alex." (*Id.* ¶ 8). "The second was in a preliminary discussion exploring the

possibility of [Defendant] buying out Plaintiff's shares, in which [Heller] simply reminded Mr. Lane that if Alex did inherit [Defendant's] shares, Alex would have the ability to include Plaintiff in the ownership of his inherited shares and the management of the Companies if he elected to do so." (*Id.*).

As to discussion of "Plaintiff's concerns about her lack of present financial benefits as a shareholder," Heller states that "those discussions were strictly in the context of Plaintiff's ongoing grievances about her limited rights as a minority shareholder . . . and in preliminary buyout discussions." (*Id.* ¶ 10). Heller denies ever linking "the economic benefit (or lack thereof) of Plaintiff's shares to any contemplated disposition by [Defendant] of his shares." (*Id.*).

### 3.    Analysis

In this case, Plaintiff seeks a declaration "that the Shareholder Agreements, including the rights of first refusal set forth therein, are valid and binding, and that they apply to the parties and to the shares of the Companies that the parties presently own." (Dkt. No. 1, ¶ 23). Defendant argues that Plaintiff's request for declaratory relief is not ripe for review because it presents a "hypothetical controversy" based on "vague, speculative and conclusory" allegations that are "devoid of any allegations supporting an actual, present intent to transfer the shares" and that it therefore must be dismissed as nonjusticiable. (Dkt. No. 13-1, at 1, 7–11). Plaintiff responds that Defendant's "inten[tion] to transfer [the Companies'] shares" presents an actual controversy and that she "should not have to wait to suffer . . . actual, and likely irremediable, harm before seeking a declaration of her rights." (Dkt. No. 16, at 12–18).

To be justiciable under Article III, "a cause of action must be ripe—it must present 'a real, substantial controversy, not a mere hypothetical question.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (quoting *AMSAT Cable Ltd. v. Cablevision of Conn.*, 6 F.3d 867, 872 (2d Cir. 1993)). The doctrine of ripeness "is peculiarly a question of timing," *id.* at

687 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)), which

"prevents courts from declaring the meaning of the law in a vacuum and from constructing

generalized legal rules unless the resolution of an actual dispute requires it," *Simmonds v. I.N.S.*,

326 F.3d 351, 357 (2d Cir. 2003). "As a corollary, federal courts may not 'decide abstract

questions,' or 'give opinions advising what the law would be upon a hypothetical state of facts.'"

*Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 91–91 (2d Cir. 2023) (internal

citation omitted) (first quoting *Socialist Lab. Party v. Gilligan*, 406 U.S. 583, 586 (1972); and

then quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). "The controversy must at all times

remain 'definite and concrete, touching the legal relations of parties having adverse legal

interests.'" *Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d

398, 403 (S.D.N.Y. 2012) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127

(2007)). "'[T]hroughout the litigation,' the party seeking relief 'must have suffered, or be

threatened with, an actual injury traceable to the defendant and likely to be redressed by a

favorable judicial decision.'" *United States v. Juv. Male*, 564 U.S. 932, 936 (2011) (alteration in

original) (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)).

The Declaratory Judgment Act ("DJA") provides that "[i]n a case of actual controversy

within its jurisdiction . . . any court of the United States may declare the rights and other legal

relations of any interested party seeking such declaration, *whether or not further relief is or*

*could be sought*." 18 U.S.C. § 2201(a) (emphasis added). "In other words, the DJA 'creates a

means by which rights and obligations may be adjudicated in cases involving an actual

controversy that has not reached the stage at which either party may seek a coercive remedy.'"

*Admiral Ins. Co.*, 57 F.4th at 92 (quoting *United States v. Doherty*, 786 F.2d 491, 498 (2d Cir.

1986)). However, the DJA neither "provide[s] a court with jurisdiction," *California v. Texas*, 141

S. Ct. 2104, 2115 (2021), nor "extend[s] the jurisdiction of the federal courts," *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 196 (2014) (internal quotation marks omitted). "[T]he phrase 'case of actual controversy' in the [DJA] refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune*, 549 U.S. at 127 (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)). Indeed, "the 'relevant inquiry for [the DJA's case-of-actual-controversy] prerequisite is *coextensive* with the analysis applicable to the 'case[-]or[-]controversy' standard embodied in Article III.'" *Admiral Ins. Co.*, 57 F.4th at 92 (alteration and emphasis in original) (quoting *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 406 (S.D.N.Y. 2002)).

Acknowledging that "[t]he difference between an abstract question and a 'controversy' contemplated by the [DJA] is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy," *id.* (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)), the Second Circuit has provided the following guidance:

> "Basically," . . . the critical "question . . . is whether . . . there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." "That the liability may be contingent does not necessarily defeat jurisdiction of a declaratory[-]judgment action. Rather, courts should focus on the *practical likelihood* that the [relevant] contingencies will occur."

*Id.* (emphasis in original) (citations omitted) (first quoting *MedImmune*, 549 U.S. at 127; and then quoting *Emps. Ins. of Wausau v. Fox Ent. Grp., Inc.*, 522 F.3d 271, 278 (2d Cir. 2008)). A relevant touchstone is whether the relief sought "relates to a dispute where the alleged liability has already accrued or the threatened risk occurred, or rather whether the feared legal

consequence remains a mere possibility, or even probability of some contingency that may or may not come to pass." *Dow Jones*, 237 F. Supp. 2d at 406–07 (citation omitted).

In his declaration Defendant concedes that the Shareholder Agreements govern the sale or transfer of either party's shares during their lifetimes. (Dkt. No. 20-1, ¶ 11). Defendant states that he has "never had any intention of selling or transferring [his] shares during [his] lifetime without complying with the Shareholder Agreements." (*Id.* ¶ 14). Defendant says that he "presently intend[s] to leave [his] shares to [his] son . . . by testamentary bequest." (*Id.* ¶ 12). He claims that the parties "are precluded from enforcing the transfer restrictions to prevent the other's testamentary bequest of the shares to [their] respective heirs" based on the "result of the divorce proceedings." (*Id.*).

Plaintiff has failed to establish anything beyond Defendant's present intent to make a testamentary bequest of the shares to their son Alex. Specifically, Plaintiff has failed to show that Defendant has transferred, or intends to transfer, his shares without complying with the Shareholder Agreements. Plaintiff states that she does "not communicate directly with" Defendant, and has learned of his statements "through others, including his attorney and his accountant." (Dkt. No. 17, ¶ 4). While Lane, Plaintiff's counsel, filed a declaration stating that Heller, Defendant's counsel, "has stated to me several times, unequivocally and in clear terms, that [Defendant] intends to transfer his shares to [his son] Alex," and that "the transfer of shares to [Plaintiff] in the divorce proceedings rendered the Rights of First Refusal 'invalid,'" (Dkt. No. 18, ¶ 2), Lane did not provide any dates of such conversations or indicate when Defendant planned to transfer shares to Alex. Moreover, Heller states that he has "never represented that [Defendant] has any intention" to "sell or transfer his shares during his lifetime without complying with the terms of the Shareholder Agreements," but has told Lane that Defendant

"intends to leave his shares to his son Alex by testamentary bequest in his will." (Dkt. No. 20-2, ¶¶ 6–7). Thus, on this record, Plaintiff has failed to establish any intent by Defendant to sell or transfer the shares in question imminently, or, indeed, at any point during his lifetime. Plaintiff's fear that Defendant will sell or transfer his shares is only a "mere possibility. . . that may or may not come to pass." *Dow Jones*, 237 F. Supp. 2d at 406–07 (citation omitted). Accordingly, the Court turns to the parties' arguments concerning Defendant's present intent to make a testamentary bequest of the shares to Alex.

The parties' disagreement as to the posthumous enforceability of the Shareholder Agreements may well constitute "an authentic difference of legal opinion." *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, No. 17-cv-446, 2018 WL 485976, at *4, 2018 U.S. Dist. LEXIS 8240, at *12 (S.D.N.Y. Jan. 18, 2018) (citation omitted); *see also Mtume v. Sony Music Ent.*, No. 18-cv-11747, 2020 WL 832814, at *4, 2020 U.S. Dist. LEXIS 29133, at *12 (S.D.N.Y. Feb. 20, 2020) (finding the plaintiff musician's 2018 request for a declaration that the copyrights Sony held on his sound recordings were terminable as of 2020 presented a "live dispute" based on Sony's stated position that the copyrights were not terminable). But that is not enough to give the Court jurisdiction where, as here, such an opinion is "abstracted from any concrete actual or threatened harm." *Ambac Assurance Corp.*, 2018 WL 485976, 2018 U.S. Dist. LEXIS 8240, at *12 (quoting *Alvarez v. Smith*, 558 U.S. 87, 93 (2009)).

Plaintiff fails to show such harm because any potential injury to her turns on "nebulous future events so contingent in nature that there is no certainty they will ever occur." *Thomas v. City of N.Y.*, 143 F.3d 31, 34 (2d Cir. 1998) (quoting *In re Drexel Burnham Lambert Grp. Inc.*, 995 F.2d 1138, 1146 (2d Cir. 1993)). Plaintiff has not alleged any facts that suggest any actual or imminent injury as a result of Defendant's stated position or intention to bequest the shares to his

son. In *Mtume*, the plaintiff alleged that Sony's refusal to recognize his copyright termination rights in 2018 "created a cloud over [the plaintiff's] future copyright ownership in the sound recordings." 2020 WL 832814, at *5, 2020 U.S. Dist. LEXIS 29133, at *12. The court found this allegation was sufficient to show "actual or imminent" injury because while the plaintiff could not enter enforceable contracts until the 2020 termination date, he could begin negotiations and Sony's position hindered Plaintiff's negotiations by creating "uncertainty" regarding the plaintiff's "future ability to consummate these negotiations." *Id.* Here, by contrast, Plaintiff does not identify any injury or difficulty Defendant's statements regarding his intent to bequest the shares to Alex pose to her share ownership or any right of first refusal.

Moreover, in this case, as Defendant points out, a declaratory judgment would rest on numerous contingencies: "Plaintiff or Alex could predecease Defendant, [] the Companies could be sold" or "Defendant may [] change his will." (Dkt. No. 20, at 6); *see Matter of Hennel*, 29 N.Y.3d 487, 493 (2017) ("[W]ills are ambulatory in nature, and decedent was free to alter his . . . will until death." (citation omitted)). Defendant admits that his present intent to leave his shares to his son could change. (Dkt. No. 20-1, ¶ 14). And, if Plaintiff did not predecease the Defendant, and his will provided for a bequest of his shares to Alex, "Plaintiff would . . . have the right to challenge the will." (*Id.* (emphasis omitted)). In short, Plaintiff's feared consequence—Defendant transferring his shares in violation of the Shareholder Agreements—is, at best, a "probability of some contingency that may or may not come to pass." *Dow Jones*, 237 F. Supp. 2d at 406–07; *see also Harbor Distrib. Corp. v. GTE Operations Support Inc.*, 176 F. Supp. 3d 204, 212 (E.D.N.Y. 2016) ("Plaintiff is . . . not entitled to a declaration that, if, in the future, defendants should attempt to terminate the lease, doing so would be improper because defendants have not—or will have not—complied with the requisite preconditions for

termination. To make such a ruling would require the Court to assume that defendants will eventually terminate the lease and to speculate about the status of the . . . termination preconditions at that theoretical time." (footnote omitted)). Thus, Plaintiff has not met her burden of demonstrating the existence of an actual or imminent injury or justiciable controversy.

Plaintiff argues that under cases such as *American Machine & Metals, Inc. v. De Bothezat Impeller Co.*, 166 F.2d 535 (2d Cir. 1948) and *Gilbert, Segall & Young v. Bank of Montreal*, 785 F. Supp. 453 (S.D.N.Y. 1992), a claim is ripe if the plaintiff faces the prospect of significant financial hardship, even if the injury is remote. (Dkt. No. 16, at 13–15). Plaintiff claims that the shares in question "are worth tens of millions of dollars" and, if Defendant violates the Shareholder Agreements, "[t]he prospect of [her] being able to recover . . . damages and to void the transaction . . . is not only remote and costly, but almost certainly impossible." (*Id.* at 15). But these cases are inapposite. In both cases, one of the party's "intention and desire [to breach the underlying contract] were already formed; but it could not act on its intention without the *immediate* prospect of incurring damages." *Atl. Richfield Co. v. Alcan Aluminum Holdings Ltd.*, 12 F. Supp. 2d 460, 461 (S.D.N.Y. 1997) (emphasis added); *see also American Mach.*, 166 F.2d at 536 (noting that the plaintiff "desires and intends" to exercise contractual rights and that the defendant "will sue [the] plaintiff" if it exercises those rights); *Gilbert*, 785 F. Supp. at 457 (finding that, without declaratory judgment, the plaintiff "face[d] the prospect of significant financial hardship if it carrie[d] out its intention" to breach the contract).[6] Unlike the parties in those cases who intended to imminently breach their contracts, Defendant claims that he does not intend to violate the Shareholder Agreements during his lifetime. (Dkt. No. 20-1, ¶ 10); *see*

---

[6] Notably, the Court in *Gilbert* found it "significant" that the plaintiff amended his original complaint, which asserted that the plaintiff was "considering" violating the contract, to assert that the plaintiff "desire[d] and intend[ed]" to violate the contract. 785 F. Supp. at 457.

*Harbor Distrib. Corp.*, 176 F. Supp. 3d at 208 (granting a motion to dismiss for lack of subject matter jurisdiction where the defendants "represented repeatedly to [the] Court . . . that they do not intend to terminate the lease at this time"). Thus, Plaintiff's cited cases do not compel a different result.

Accordingly, Plaintiff's request for a declaratory judgment is dismissed.

### B.      Motion To Dismiss Remaining Claims – Rule 12(b)(6)

#### 1.      Standard of Review

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor v. City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citing *Int'l Audiotext Network, Inc. v. Am. Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). Mere "labels and conclusions" are insufficient; rather, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

#### 2.      Materials Outside the Complaint

In response to Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), Plaintiff submitted seven exhibits. (*See* Dkt. Nos. 17, 17-1, 18, 18-1, 18-2, 18-3, 18-4).

Defendant also attached two declarations to his reply. (Dkt. Nos. 20-1; 20-2). There are no exhibits attached to the Complaint. (*See* Dkt. No. 1). Thus, the Court must determine which exhibits, if any, it may consider in deciding this motion.

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). However, considering "materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Id.* A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Id.* (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks omitted)). Even where a document is integral to the complaint, it must be "clear" that "no dispute exists regarding the authenticity or accuracy of the document" and that "there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner*, 463 F.3d at 134. "[I]f material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Id.* (quoting Fed. R. Civ. P. 12(d)).

The Complaint relies on the terms and effects of the Shareholders' Agreements for the following companies: ATL, (Dkt. No. 17-1, at 2–14; Dkt. No. 1, ¶¶ 8, 12–13); PBC, (Dkt. No. 17-1, at 15–23; Dkt. No. 1, ¶¶ 8, 12–13); and Pine Hill, (Dkt. No. 17-1, at 24–32; Dkt. No. 1, ¶¶

8, 12–13).[7] The Complaint also relies on the postnuptial agreement between the parties. (Dkt. No. 20-1, at 37–50; Dkt. No. 1, ¶¶ 6, 9). Further, there is no dispute as to the accuracy or authenticity of these documents. The Court may therefore consider these exhibits.

Plaintiff also submits as exhibits pleadings and orders from other court proceedings. (Dkt. Nos. 18-1; 18-2; 18-3; 18-4; Dkt. No. 20-1, at 8–35). While the Court may take judicial notice of publicly filed documents, the Court does so only to the extent they "establish the fact of such litigation and related filings." *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006). The Court does not consider these exhibits "for the truth of the matters asserted in the other litigation." *Kramer v. Time Warner Inc.*, 937 F.3d 767, 774 (2d Cir. 1991).

In addition, Plaintiff has filed two declarations—one from herself and one from her counsel—both of which contain facts not alleged in the Complaint. (Dkt. Nos. 17, 18). Defendant claims that this is an "attempt[] to impermissibly supplement the Complaint." (Dkt. No. 20, at 11 (citing *Wells Fargo Bank, N.A. v. Sharma*, 642 F. Supp. 2d 242, 244 n.1 (S.D.N.Y. 2009))). Defendant also submitted two declarations from himself and his counsel. (Dkt. Nos. 20-1; 20-2). As all four declarations contain facts outside the Complaint, the Court excludes them from consideration with respect to the motion under Fed. R. Civ. P. 12(b)(6). *See Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991) (finding the district court erred in considering affidavit containing facts outside the complaint on motion to dismiss).

---

[7] Plaintiff also purportedly relies on the Shareholders' Agreements for Coach Service America, Inc. ("Coach"), Hurley Properties, LLC ("Hurley"), and Winslow Properties, LLC ("Winslow"). (Dkt. No. 1, ¶ 8). As noted, however, Plaintiff has not submitted these companies' Shareholders' Agreements to the Court for consideration. (*See* Dkt. No. 17-1).

### 3.      Analysis

#### a.      Breach of Contract

Plaintiff alleges breach of contract under New York law. (Dkt. No. 1, ¶¶ 28–32).

Defendant moves to dismiss Plaintiff's breach of contract claim because "she has not alleged any

breach," and instead relies on "pure speculation." (Dkt. No. 13-1, at 15 (citation omitted); Dkt.

No. 20, at 14). In response, Plaintiff claims that "a repudiation of a contract is a breach." (Dkt.

No. 16, at 30 (emphasis omitted)).

To survive a motion to dismiss for a breach of contract claim under New York law, the

complaint must allege facts which show: "(i) the formation of a contract between the parties; (ii)

performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Orlander v.

Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (citing *Johnson v. Nextel Commc'ns, Inc.*, 660

F.3d 131, 142 (2d Cir. 2011)).[8] "A claim for breach of contract cannot be sustained by a

conclusory statement that the accused breached a contract." *Fuji Photo Film U.S.A., Inc. v.

McNulty*, 669 F. Supp. 2d 405, 412–13 (S.D.N.Y. Nov. 4, 2009) (citation omitted).

Here, Plaintiff does not plausibly allege that Defendant breached the rights of first refusal

in the Shareholder Agreements. Plaintiff alleges that Defendant "*may* have already engaged in

transfers in violation of [the Shareholder Agreements]." (Dkt. No. 1, ¶ 18 (emphasis added)), and

seeks damages equal to the shares Defendant transferred in violation of the rights of first refusal

"*[i]f* and to the extent Defendant has already transferred shares," (*id.* ¶ 32 (emphasis added)).

---

[8] Neither party disputes that New York law governs Plaintiff's contract claims. (Dkt. No. 13-1, at 14, 17–19 (citing New York law); Dkt. No. 16, at 19–26 (same)). The Shareholder Agreements provided by Plaintiff also state that their "construction and interpretation . . . shall be governed by the laws of the State of New York." (Dkt. No. 17-1, at 7, 20, 28). And, in general, "[i]n diversity cases involving contract disputes, the federal courts . . . apply state law." *Whittaker Corp. v. Calspan Corp.*, 810 F. Supp. 457, 462 (W.D.N.Y. Dec. 30, 1992) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Accordingly, the Court will apply New York law to Plaintiff's breach of contract claim and anticipatory breach claim.

Beyond these wholly speculative statements, Plaintiff does not allege that Defendant failed or refused to extend Plaintiff an opportunity to exercise her right of first refusal. Plaintiff merely expresses a concern that he might fail or refuse to do so in the future. Without additional facts that "nudge" Plaintiff's claim "across the line from conceivable to plausible," Plaintiff has not plausibly alleged that Defendant breached the Shareholder Agreements. *Twombly*, 550 U.S. at 569. Thus, Plaintiff fails to establish that Defendant has breached the Shareholder Agreements.

Plaintiff's argument that Defendant's alleged repudiation constitutes a breach does not compel a different outcome. A breach of contract claim based on anticipatory breach would be "entirely duplicative of the anticipatory breach claim," and is thus subject to dismissal. *Mayweather Promotions, LLC v. PAC Ent. Worldwide LLC*, No. 21-cv-4378, 2022 WL 3997014, at *6, 2022 U.S. Dist. LEXIS 158506, at *13 (S.D.N.Y. Sept. 1, 2022); *see Safka Holdings LLC v. iPlay, Inc.*, No. 12-cv-7301, 42 F. Supp. 3d 488, 481–92 (S.D.N.Y. 2013) (dismissing a breach of contract claim as "entirely duplicative" of a claim for anticipatory breach); *Waite v. Schoenbach*, No. 10-cv-3439, 2010 WL 4456955, at *7, 2010 U.S. Dist. LEXIS 115470, at *17–18 (S.D.N.Y. Oct. 29, 2010) (dismissing an anticipatory repudiation claim that was "identical to the breach of contract claim").[9]

Accordingly, Defendant's motion to dismiss Plaintiff's breach of contract claim for failure to state a claim is granted.

---

[9] Moreover, all but one of Plaintiff's cited cases discuss anticipatory breach, rather than breach of contract. (Dkt. No. 16, at 30); *see O'Connor v. Sleasman*, 788 N.Y.S.2d 518 (3d Dep't 2005) (finding that a repudiation "entitles the nonrepudiating party to claim damages for total breach" pursuant to an anticipatory repudiation claim); *QK Healthcare, Inc. v. Insource, Inc.*, 965 N.Y.S.2d 133 (2d Dep't 2013) (same). And, as explained below, Plaintiff has not plausibly alleged an anticipatory breach claim. Plaintiff's remaining case, *Firstenberg v. Wasserman*, 189 N.Y.S.2d 411 (3d Dep't 1959), also did not discuss a breach of contract claim. Rather, the Court merely noted that the underlying action, an action in equity to impress a trust pursuant to a written agreement, was "not barred by the Statute of Limitations because it did not accrue until the breach by repudiation," *id.* at 413, which does not alter the duplicative nature of Plaintiff's breach of contract claim.

### b.     Anticipatory Breach of Contract

Plaintiff alleges that Defendant anticipatorily breached the Shareholder Agreements by expressing his intent to "transfer his shares without adhering to the rights of first refusal." (Dkt. No. 1, ¶¶ 33–36). Defendant moves to dismiss Plaintiff's anticipatory breach claim because she does not plausibly allege that Defendant intends to breach the Shareholder Agreements, (Dkt. No. 13-1, at 16–17), and because Plaintiff failed to plausibly allege that she was ready, willing and able to purchase the shares at issue, (*id.* at 18–19).

Anticipatory breach "occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citations omitted). To establish an anticipatory breach, a complaint must allege "the announcement of an intention not to perform [that is] positive and unequivocal." *Mayweather Promotions, LLC*, 2022 WL 3997014, at *3, 2022 U.S. Dist. LEXIS 158506, at *7 (citations omitted); *see also DiFolco*, 622 F.3d at 112 (holding that "a repudiation can be determined to have occurred only when" it is positive and unequivocal (citations omitted)). Further, "[t]o survive a motion to dismiss, the non-breaching party must also allege that it was 'ready, willing[,] and able' to perform its obligations under the contract at the time of the alleged repudiation." *Mayweather Promotions, LLC*, 2022 WL 3997014, at *3, 2022 U.S. Dist. LEXIS 158506, at *7 (second alteration in original) (citations omitted).

Here, Plaintiff has failed to plausibly allege an anticipatory breach of the Shareholder Agreements.[10] Plaintiff alleges that, Defendant stated "directly and through others . . . that

---

[10] Generally, determining whether such an announcement is positive and unequivocal "is an issue of fact" that must be reserved for the jury. *DiFolco*, 622 F.3d at 112 (quoting *Bercow v. Damus*, 776 N.Y.S.2d 289, 290 (2004)). However, where a plaintiff fails to plead "sufficient facts to support a plausible claim for anticipatory repudiation," dismissal is warranted. *St. Christopher's, Inc. v. JMF Acquisitions, LLC*, No. 20-cv-3808, 2021 WL 6122674, at *2, 2021 U. S. App. LEXIS 38396, at *4–5 (2d Cir. 2021) (summary order).

Plaintiff [would] never receive any financial benefits from her ownership interests in the Companies." (Dkt. No. 1, ¶ 14). Further, Plaintiff alleges that, in September 2019, "Defendant advised Plaintiff, through counsel, that she could never invoke or benefit from the rights of first refusal, because they are purportedly null and void" and that, in August 2020, "he stated that position, through counsel." (*Id.* ¶ 15). Plaintiff also alleges that Defendant "proposed to buy from Plaintiff her shares in the Companies, at a price drastically lower than its value, thus using the threat of bypassing or violating the Rights of First Refusal as attempted leverage in obtaining a low-cost buyout of Plaintiff's interests." (*Id.* ¶ 14). Plaintiff does not allege that Defendant threatened to violate the rights of first refusal unless she sold her shares; she merely alleges that she interpreted Plaintiff's low offer as a threat. Even construing these allegations liberally, Plaintiff does not plausibly allege that Defendant positively and unequivocally intended to breach the rights of first refusal in the Shareholder Agreements.[11] *See DiFolco*, 622 F.3d at 112.

Plaintiff's additional allegations are legal conclusions, and are thus unavailing. *See Iqbal*, 556 U.S. at 678. For example, Plaintiff alleges that Defendant "has made positive and unequivocal statements that he refuses, and will refuse, to honor those contracts," and that Defendant "intends to transfer his shares without adhering to the rights of first refusal." (Dkt. No. 1, ¶ 35). Plaintiff offers no facts or details to support this conclusory allegation, such as when Defendant expressed this intent or the words he used. *Cf. Armstrong Pump, Inc. v. Hartman*, 745 F. Supp. 2d 227, 237 (W.D.N.Y. 2010) (finding that the complaint's allegations that the defendant, "rather than give [the plaintiff] its contractual right of first refusal," had "indicated that it will proceed with the sale, enter[ed into an] agreement to transfer the rights to [another

---

[11] The complaint contains no factual assertions regarding Defendant's intent to bequeath his shares to Alex; those assertions arise solely in the declarations the parties submitted, which, as discussed, the Court does not consider here.

company] on June 7, 2010, [and] asserted that it would sell the issued patents and improvements to [the other company] on June 7, 2010," were sufficient to allege anticipatory breach) (citations omitted).[12]

Thus, Plaintiff does not plausibly allege that Defendant expressed a positive and unequivocal intent to breach the Shareholder Agreements. Accordingly, Defendant's motion to dismiss Plaintiff's anticipatory breach claim for failure to state a claim is granted.[13]

## IV.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 13) is **GRANTED**; and it is further

**ORDERED** that that complaint (Dkt. No. 1) is **DISMISSED** without prejudice; and it is further

**ORDERED** that the Clerk is directed to close this case.

**IT IS SO ORDERED.**

Dated: February 7, 2023
       Syracuse, New York

Brenda K. Sannes
Brenda K. Sannes
Chief U.S. District Judge

---

[12] Defendant further argues that Plaintiff has failed to plausibly allege that she was ready, willing and able to perform. (Dkt. No. 13-1, at 18–19). Because Plaintiff has failed to plausibly allege a positive and unequivocal intent to transfer his shares in violation of the Shareholder Agreements, the Court need not reach this argument.

[13] Plaintiff also seeks an injunction prohibiting Defendant from transferring any shares in violation of the Agreements. (Dkt. No. 1, ¶¶ 19–27). An injunction is a remedy, not a cause of action. *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406–07 (S.D.N.Y. Nov. 15, 2010) (citations omitted). Because the Court has dismissed Plaintiff's substantive claims, she cannot sustain a separate action seeking injunctive relief. Accordingly, to the extent Plaintiff seeks standalone injunctive relief, the claim is dismissed. *See Springfield Hosp. v. Hofmann*, No. 09-cv-254, 2011 WL 3421528, at *3–4, 2011 U.S. Dist. LEXIS 86466, at *11 (D. Vt. Aug. 4, 2011) (explaining that the Court cannot grant injunctive relief where "no substantive federal claim remains upon which [a] [p]laintiff can base its request[]") (citation omitted)).